D/F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X
                            :

RICARDO MENDEZ,                  :    11-CV-5492 (ARR)

             Petitioner,      :    NOT FOR ELECTRONIC
                            :    OR PRINT PUBLICATION
  -against-                 :
                            :    OPINION AND ORDER
HAROLD D. GRAHAM,        :

             Respondent.     :

------------------------------------------------------------------- X

ROSS, United States District Judge:

      Ricardo Mendez ("Mendez" or "petitioner"), appearing pro se, petitions this court for a

writ of habeas corpus pursuant to 28 U.S.C. § 2254. Mendez was convicted in the Supreme

Court of New York, Kings County, of three counts of Robbery in the First Degree, three counts

of Robbery in the Second Degree, and one count of Criminal Possession in the Seventh Degree.

Because Mendez had been previously adjudicated a persistent felony offender, the trial court

sentenced him to twenty years to life on the robbery counts, but ran one of the sentences

consecutive to the others, resulting in an effective prison term of forty years to life. Mendez

challenges his convictions and sentence on the grounds that (1) the trial court gave prejudicial

instructions to the jury that drew attention to his decision not to testify; (2) he was denied a fair

trial when the prosecutor was permitted to elicit testimony from a detective that Mendez was

arrested immediately after being identified in a lineup; (3) Mendez's sentence violated Apprendi

v. New Jersey, 530 U.S. 466 (2000), and was excessive; (4) the evidence was insufficient to

support conviction because another person confessed to the crime via sworn affidavit. Mendez

1

also seeks to amend his petition to add the ground that his right to confront the witnesses against him was violated when detectives testified that they came to suspect Mendez and his co-defendant based on interviews with unnamed witnesses who did not testify at trial. Mendez's motion to amend the petition is granted, and for the reasons discussed below, the petition is denied.

## BACKGROUND

I.    *The Crime*

On September 14, 2001, two men robbed the Seagate Medical Center at 2909 Surf Avenue in Brooklyn. That afternoon, three employees of the Medical Center, Alexander Zakharov ("Zakharov"), Igor Shulgin ("Shulgin"), and Andre Sanzharevsky ("Sanzharevsky"), were sitting in an office watching news coverage of the September 11 terrorist attacks, which had taken place three days prior. R. at 7-8.[1] Zakharov noticed a man peeking into the office, and thought it must be a patient of Dr. Marc Jacobs ("Jacobs"), the chiropractor who used office space at the Medical Center. R. at 10-11. The man pointed at Shulgin and gestured to him to come out of the office. R. at 11. Shulgin left the room and a few seconds later Zakharov followed him. R. at 12. Zakharov then noticed the man was holding Shulgin by the arm and had his right hand placed inside his own pocket. R. at 12-13. Zakharov believed he was holding a firearm. Id. The man, later identified as Reggie Reid ("Reid"), R. at 15, asked Zakharov and Shulgin, "[W]here is the safe, where is the cash, we know there is cash in here, where is the fucking money, where is the fucking cash, I will blow your heads off, . . . where's the money[?]"

---

[1]The trial transcript in this case is divided into three parts: the Voir Dire Record ("VDR"), the record of the trial ("R"), and the sentencing hearing ("S"). See Resp. to Order to Show Cause, Dkt. #6, Exs. 3-6.

R. at 16. Reid then commanded them to open the safe. R. at 17.

About thirty seconds later, another man walked into the room. Id. He was significantly shorter than the first man: about five feet, five inches tall. R. at 19, 106. This individual, later identified as Mendez, R. at 27, was wearing a hood that covered the top portion of his face. R. at 18. Zakharov was able to see his nose and chin. Id. According to Zakharov, Mendez was "jumping around," "screaming, don't look at my face, don't look at my face." R. at 19. Mendez told Zakharov to face the wall. Id. At the same time, Reid took a watch from the safe, which Shulgin had opened. R. at 20. The two men then left the room. Id. At that point, Zakharov attempted to call 911. R. at 21. Reid returned to the room and "proceeded to rip [the phone] out of the wall and to say, I dare you, I freaking dare you, nobody is going to come and help you, everybody is down at the World Trade Center, don't do anything stupid." Id. Reid then stole cash from Shulgin, cash, a Cartier watch, and a gold bracelet from Sanzharevsky, and about $30-40 cash and a $450 watch from Zakharov. R. at 21-25. The man identified as Mendez also robbed Jacobs, the chiropractor, of about $150, R. at 110, in addition to taking a chain from a patient who was in the building and watches from an acupuncturist and a physical therapist. R. at 112. The two men then left the scene. Id.

II.     *Arrest & Lineup*

Based on "certain anonymous tips and phone calls," S. at 5, as well as information from Richard Lugo, an informant who could not be located for trial, S. at 6-7, 11, the police suspected that Reid and Mendez committed the crime. The police first picked up Reid, and on October 2, 2001, conducted a lineup. R. at 139-40. Zakharov, Sanzharevsky, and Jacobs came to view the lineup, R. at 142, and Zakharov identified Reid, R. at 36. Mendez was arrested on October 4,

3

2001. R. at 186. That day, the police conducted another lineup, which Zakharov and Sanzharevsky viewed. R. at 188. Mendez was included in the lineup, along with five "fillers." R. at 190. One of the fillers was close to Mendez in height: five feet, six inches tall. R. at 218. The other fillers were all taller: one was five feet, nine inches; two were five feet, ten inches; and one was six feet, five inches. Id. Zakharov identified Mendez in the lineup. R. at 38. While Mendez was at the precinct, he was subjected to a strip search, during which six glassines of heroin fell from his rectum. R. at 191. When placed under arrest following the lineup, Mendez made a statement to a detective that he "went to the location with the guys, the guys went in the back, he was up front, he got scared and ran out." R. at 200.

The People indicted Mendez and Reid for Robbery in the First Degree (N.Y. Penal L. § 160.15[4]), Robbery in the Second Degree (N.Y. Penal L. § 160.10[1]), Robbery in the Third Degree (N.Y. Penal L. § 160.05), Grand Larceny in the Fourth Degree (N.Y. Penal L. § 155.30[5]), and Petit Larceny (N.Y. Penal L. § 155.25). Mendez was also charged with Criminal Possession of a Controlled Substance in the Seventh Degree (N.Y. Penal L. § 220.03).

III.  *First Trial*

Mendez and Reid were tried jointly and convicted on December 12, 2002. People v. Mendez, 804 N.Y.S.2d 337, 338 (N.Y. App. Div. 2005). Zakharov testified at that trial and identified Mendez. Br. for Def.-Appellant, People v. Mendez, No. 02-11538, at 31, Dkt. #6, Ex. 2. He was the only witness to positively identify Mendez. Id. In summation, the prosecutor "made certain statements that insinuated that more than one witness had identified the defendant." Mendez, 804 N.Y.S.2d at 338. Specifically, the prosecutor stated, "I could have brought in 15 witnesses. They would have all told you the same thing. It's not the quantity; it's

4

the quality of the evidence." Id. Based on these statements, and "in light of the less than overwhelming evidence of guilt adduced at trial," the Appellate Division reversed both convictions on October 17, 2005. Id. at 339; People v. Reid, 801 N.Y.S.2d 905, 906 (N.Y. App. Div. 2005).

IV.   *Second Trial*

The trial that is the subject of this habeas petition followed, starting on October 11, 2006. VDR. at 1. Mendez and Reid were again tried together, with Ivan Vogel representing Mendez and George Sheinberg representing Reid. VDR. at 3. Howard Jackson represented the People. Id. The voir dire lasted three days. VDR. at 241. The court gave several preliminary instructions to the panel of prospective jurors not to draw any adverse inference from the defendants' decision not to testify. VDR. at 249-50, 259-60. Defense counsel also both questioned prospective jurors on their ability not to draw any adverse inference from a decision not to testify. VDR. at 308-09 (Sheinberg); VDR. at 315 (Vogel). After a jury was selected, the trial then proceeded as follows (with portions of the record that are relevant to petitioner's claims highlighted):

(a)   Alexander Zakharov

The People first called Zakharov. R. at 4. Zakharov testified that he was working at Seagate Medical Center on September 14, 2001. R. at 5-6. He first saw Reid when Reid peeked in the door to the office. R. at 9. He saw Reid's face "very well." R. at 10. He then saw Reid holding onto Shulgin, and believed he had a gun by the way his pocket was bulging. R. at 12-13. Zakharov identified Reid in the courtroom. R. at 15. After Reid demanded that Zakharov and Shulgin give him access to the safe, a second man came into the room. R. at 16. This man had a

hood covering his face, and Zakharov could see only his nose and chin. R. at 18. He noticed that the man was shorter than everybody else – around five feet, five inches – and was "jumping around." R. at 19. While he was jumping, Zakharov saw the man's face. R. at 26. He testified, "For the most part I saw the rear part of his face, but when the flap came up I could make out the rest of his face." Id. Zakharov also testified the man was approximately one to three feet from him and he could smell liquor on the man's breath. Id. Zakharov identified Mendez as the second man involved in the robbery. R. at 27. The entire robbery lasted between five and ten minutes, according to Zakharov. R. at 29. Neither assailant ever brandished a gun during the robbery, but Zakharov believed both defendants to be armed. Id.

Zakharov testified that he identified both Reid and Mendez in lineups at the precinct on October 2 and October 4, 2001, respectively. R. at 36, 38. Over objection, Zakharov testified that he was "very certain" of his identification of Mendez in the lineup. R. at 39. He also testified that the Medical Center was well lit at the time of the robbery. R. at 40.

On cross examination, Sheinberg attempted to establish that Zakharov had told an assistant district attorney at the October 2 lineup that four individuals came into the Medical Center during the crime, but Zakharov testified that he did not remember this conversation. R. at 51-52. On cross examination by Vogel, Zakharov said that he had seen the police reports in the case. R. at 72. Vogel then asked, "So it's fair to say you have read documents from other witnesses, correct?" To which Zakharov responded, "Statements from other – no, I don't think I read statements from other witnesses." Id. Zakharov also stated that the entire incident happened quickly and he was frightened. R. at 77.

6

(b)     Marc Jacobs

Jacobs testified that he was seeing patients at the Medical Center on the day of the crime. R. at 102. He was in his office when he heard a receptionist nearby muttering, "[O]h my God, oh my God." R. at 103. A voice behind her said, "[D]on't turn around." Id. A male Hispanic wearing a sweat shirt with the hood up entered Jacobs's office. R. at 105-06. Jacobs briefly looked at the man's face and the man said, "don't look into my face." R. at 105. Jacobs testified the man was a few inches shorter than Jacobs, who is five foot, nine inches. R. at 106. At some point he saw a taller, black male as well. R. at 107. Jacobs testified, "[The Hispanic man] had his hands in his pocket. He had a gun. One hand. . . . He threatened to blow my head off if I didn't stop turning around. . . . He said, don't fucking turn around or I'll blow your head off." R. at 108. There was a commotion in the other room and the Hispanic man turned around; Jacobs then took his watch off and threw it in the corner to hide it. R. at 109. The Hispanic man then began rummaging through Jacobs's pockets. R. at 110. Jacobs did not get another look at the man's face. Id.

Jacobs went to the October 2 lineup but did not identify anyone. R. at 116. He never saw a second lineup. R. at 117. On cross examination, Jacobs testified that he did not notice any alcohol on the Hispanic man's breath. R. at 128. Jacobs did not make any in-court identifications during his testimony.

(c)     Det. Closs

The People next called Det. John Closs. R. at 132. Det. Closs was assigned to investigate the robbery and went to the Medical Center on September 17, 2001. R. at 135. Early on in his testimony, the following colloquy took place:

Q [BY MR. JACKSON]: Throughout your investigation in this case did you have occasion to interview victims and other witnesses?

MR. VOGEL: Objection, Judge.

THE COURT: Overruled.

A: Yes.

Q: Detective Closs, throughout your investigation of this case did you come to learn how many people had committed this robbery?

A: Yes.

MR. VOGEL: Objection.

THE COURT: That's overruled.

Q: How many people?

A: 2.

Q: Were you given as a result of your interviews with various victims and witnesses descriptions of these 2 individuals?

A: Yes.

MR. VOGEL: I object to witnesses and victims.

THE COURT: Excuse me?

MR. VOGEL: Can we approach?

THE COURT: Step up.

(Whereupon, an off-the-record discussion was held at the bench.)

THE COURT: Overruled.

Q: Detective, let me ask you this: As a result of your investigation did you obtain a description of the 2 individuals you learned had committed this robbery?

A: Yes.

Q: What were those descriptions?

MR. VOGEL: Objection. Hearsay.

THE COURT: That is overruled.

A: Male black, approximately 35 years old, high cheek bones; a male Hispanic, approximately 28 years old, dark hair.

Q: Were you also given, provided a description with regards to their heights, their approximate heights?

[ . . . ]

A: I recall that the male black was approximately 5 10 and the male Hispanic was shorter than that.

THE COURT: Ladies and gentlemen, it is being offered just to show the information he had and why he proceeded on the investigation the way he did. Okay? Proceed.

R. at 135-37. Det. Closs then described his role in orchestrating the October 2, 2001, lineup. R. at 140-48.

(d)    Conference Held Out of Presence of the Jury

Following the cross-examination and redirect of Det. Closs, the court held a conference with the attorneys out of the presence of the jury. R. at 171. Mr. Vogel explained that his objection at the bench during Det. Closs's testimony was to

the testimony that Detective Closs interviewed witnesses in this case and then basically I think he said victims and other witnesses. My objection is based on the fact that the only witnesses in this case really were the victims, there were no other witnesses, and I believe it gives the false impression to the jury that other people may have witnessed this crime and it also violates my client's right of confrontation, to confront these alleged witnesses.

Id. The court responded, "I do believe there was an independent witness. The gentleman we can't find, Lugo?" Id. at 172. The court then said:

I'm almost rethinking it now to permit the detective to testify that their investigation produced evidence that these defendants might have been involved in this. That is why they were focused on them, that is why they are looking at them. It does not go in for its truth. It may not be considered by the jury in establishing his guilt one way or another, but simply . . . may be allowable as background or narrative because juries might "wander helpless" trying to sort out ambiguous but material facts.

R. at 172-73. The prosecutor told the court there was a "gaping hole in the narrative of events" as to "how these detectives came or were lead to these 2 defendants" and asked the court for "leeway" to elicit testimony from the next witness, Det. Joseph Dalton, on why the police focused on Mendez and Reid. R. at 174. Mr. Sheinberg then objected that this strategy would violate his client's right to confrontation. R. at 175. The prosecutor said, "I would be seeking to ask Detective Dalton this: Did you interview witnesses . . . that were not victims in this case as a result of your interviews; did you develop any suspects in this case; yes; who were the suspects?" R. at 177. Mr. Vogel and Mr. Sheinberg objected. Id. The court indicated it would permit a question such as "during the course of your investigation did you receive information that these 2 defendants might have been involved," id., and promised to give an instruction that the answer would "not be for guilt or innocence, simply to explain why the police officers did focus on these 2 gentlemen," R. at 178. The court settled on this solution after some further discussion and informed defense counsel, "Both of you have an exception." R. at 180.

 (e) <u>Det. Dalton</u>

The People next called Det. Dalton. R. at 182. After identifying the defendants, R. at 184-85, the prosecutor asked, "And as a result of that investigation with Detective Closs, did you obtain information that led you to believe that these 2 defendants might have been involved in the robbery of September 14th, 2001?" R. at 185. Det. Dalton replied, "Yes, I did." <u>Id.</u> The

court then issued the following instruction:

> Ladies and gentlemen, the fact that they developed information, you are not to consider it when you determine the guilt or innocence. The reason I'm allowing to you hear it [sic] is to explain to you why the officers focused on these 2 defendants during the course of their investigation. Not to be considered for their guilt, only to explain why they were looking for them or they focused on them. Everybody understand that? Good.

R. at 185-86. Det. Dalton then described the circumstances of his arrest of Mendez, including the search that turned up the heroin in Mendez's possession, R. at 186, 191. Det. Dalton testified that when Mendez saw him pulling up next to him on the street, he ran into the lobby of a nearby building and ran into the elevator, where Det. Dalton ultimately apprehended him. R. at 186. Det. Dalton then testified about the October 4 lineup, R. 187-88, after which the prosecutor asked him:

> Q: Did there come a time, Detective, after conducting the lineup in this case that you took official police action with respect to the defendant Mendez?
>
> A: Yes, there was.
>
> Q: What did you do?
>
> A: I placed the defendant under arrest.

R. at 197. Mr. Vogel did not object to this line of questioning. Det. Dalton testified that after he placed Mendez under arrest and read him <u>Miranda</u> warnings, Mendez made a statement "that he went to the location with the guys, the guys went in the back, he was up front, he got scared and ran out." R. at 200.

(f)     Charge and Jury Deliberations

Following Det. Dalton's testimony, the People and the defense rested. R. at 258. In summation, Mr. Vogel argued that Zakharov was not lying; rather, he was simply mistaken in his

11

identification of Mendez as the person who robbed him. R. at 276-78, 280-82. The court then charged the jury. The court included the following charge: "The fact that the defendants did not testify is not a factor from which any inference unfavorable to them may be drawn." R. at 342. The court also instructed the jury:

> [D]uring the trial I permitted testimony from Detective Joseph Dalton concerning information which led the police to focus their investigatoin on these 2 defendants as possible perpetrators of the crimes. This evidence was permitted and introduced solely for a very limited purpose. In this instance, such testimony was not, again, not admitted for its truth. I admitted such testimony only to allow the jury to understand why the police focused on these 2 defendants as suspects in this matter. You are not to consider anything provided in that portion of the testimony of Detective Dalton for the purpose of establishing that the defendants committed the crime.

R. at 348-49.

Following the charge, the jury retired to deliberate. During deliberations, the jury sent notes asking for "the height and weight of all lineup fillers for both defendants," R. at 385, a request for clarification on the alternate degrees of larceny, R. at 386, a request to read back Jacobs's testimony regarding his inability to identify anyone in the lineup, R. at 403, a request for clarification on accomplice liability, id., a second request for the Jacobs testimony regarding the Reid lineup, R. at 410, a request to "read back Jacob's [sic] ID of Mendez in the courtroom," R. at 412, and a request to "read back all the testimony regarding Mendez' confession of being at the scene of the robbery," id. The jury then announced they had reached a verdict, finding both defendants guilty on all counts. R. at 414-17.

(g)     Sentencing

At sentencing, Mr. Vogel argued that the sentence Mendez received after his first trial – forty years to life – was excessive, and a "more reasonable" sentence was justified. S. at 18-19.

12

The prosecutor noted that Mendez was adjudicated a mandatory persistent felony offender at the prior trial's sentencing and asked for the same sentence to be imposed. S. at 19. The court reviewed Mendez's criminal record, which included adult convictions in 1984, 1988, and 1999. S. at 21. The court then said:

> And what is most troubling, and I share the DA's position on this. These defendants took perhaps the worst day in this country's history, 9/11, and used it for their own personal gain. And not only did Mr. Mendez use this for his personal gain, but he mocked the victims, go ahead, call the police, they're not coming, they're down at ground zero. And to take such a tragic set of circumstances, and to use the chaos created by that to take advantage, to rob somebody, and during the course of the robbery to mock the victims, I find absolutely reprehensible.

R. at 21-22. Mr. Vogel did not object or otherwise correct the record that it was Reid, not Mendez, who "mocked the victims." Id. The court then sentenced Mendez to twenty years to life on the three robbery counts, with one count running consecutive to the others. R. at 22-23. Mendez was sentenced to one year for the possession of a controlled substance charge to run concurrent with the robbery charges. R. at 23.

V.  *Post-trial proceedings*

Mendez, represented by appellate counsel, timely filed a direct appeal in the Appellate Division, Second Department. See Br. for Def.-Appellant, People v. Mendez, No. 07-03854, Dkt. #6, Ex. 1. His brief raised three issues: (1) Whether the trial court's charge to the jury not to draw an adverse inference from the defendants' decision not to testify, which was not requested by defendants, violated Mendez's Fifth Amendment right against self-incrimination; (2) Whether Zakharov's testimony was improperly bolstered based on (a) the detectives' testimony that they interviewed "witnesses" and "victims" who did not testify at trial, (b) Det. Dalton's testimony

that he arrested Mendez after the lineup, and (c) the implication that Sanzharevsky, who did not testify, identified Mendez in the lineup; (3) Whether the sentence was excessive and whether New York's persistent felony offender statute was unconstitutional under Apprendi v. New Jersey, 530 U.S. 466 (2000). See id. at 3-4.

Shortly after his conviction, Mendez also filed a motion pursuant to N.Y. Crim. Proc. L. § 440.10 to vacate a judgment, purporting to present newly discovered evidence. See People v. Mendez, 894 N.Y.S.2d 901, 901 (N.Y. App. Div. 2010) (reviewing Supreme Court denial of § 440.10 motion). The new evidence was an affidavit from a fellow prisoner confessing to the crime. See Dkt. #13. The Supreme Court, Kings County, denied the motion without a hearing on October 17, 2007. See 894 N.Y.S. 2d at 901.

On March 2, 2010, the Appellate Division, Second Department, ruled on both the direct appeal and Mendez's appeal of the denial of his § 440.10 motion. Id.; People v. Mendez, 894 N.Y.S.2d 902 (N.Y. App. Div. 2010). With respect to the issues raised on direct appeal, the Appellate Division held: (1) the claim of error for the "no inference charge" was unpreserved for appellate review and any error was harmless; (2) the claim of error for the admission of testimony that Mendez was arrested immediately after the lineup was unpreserved for appellate review and any error was harmless; (3) the claim of an Apprendi violation was unpreserved for appellate review and was without merit; further, the sentence was not excessive. 894 N.Y.S.2d at 902. In addition, the Appellate Division held, "The defendant's remaining contentions are without merit." Id.

In its review of the Supreme Court's denial of Mendez's § 440.10 motion, the Appellate Division held that the Supreme Court was within its discretion to deny the motion without a

hearing because the affidavit submitted "merely contradicted the evidence adduced at the trial, and was not 'of such a character as to create a probability that had [it] been received at the trial the verdict would have been more favorable to the defendant.'" 894 N.Y.S.2d at 901 (alteration in original) (quoting N.Y. Crim. Proc. L. § 440.10(1)(g)).

Mendez sought leave to appeal to the New York Court of Appeals, which declined review on June 18, 2010. People v. Mendez, 933 N.E.2d 225 (N.Y. 2010); Dkt. #1, Ex. F. Mendez did not file a petition for a writ of certiorari in the U.S. Supreme Court. Dkt. #1, at 2.

Mendez filed another motion pursuant to N.Y. Crim. Proc. L. §§ 440.10 and 440.20 challenging the constitutionality of his sentence given the disparity between his sentence and that of Reid,[2] and alleging ineffective assistance of counsel for counsel's failure to correct factual errors the court relied on in sentencing. Dkt. #1, at 3. This motion was denied on September 7, 2011. Id. Mendez filed the instant petition in this court on October 31, 2011. Id. at 14.

## DISCUSSION

I.      *Standard of Review*

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a deferential standard that federal habeas courts must apply when reviewing state court convictions. 28 U.S.C. § 2254(d). The statute provides, in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an

---

[2]According to Mendez's direct appeal brief, Reid was sentenced to an aggregate term of thirty years' imprisonment. Dkt. #6, Ex. 1, at 3.

> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

Id. Here, petitioner does not argue that the adjudication of his claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," so at issue is whether the state court's decision resulted in a decision involving an unreasonable application of clearly established Federal law. Id.

The statutory language "clearly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established Supreme Court precedent if "the state court applies a rule that contradicts" Supreme Court precedent or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from that precedent." Id. at 405-06. With respect to the "unreasonable application" clause, "a federal habeas court . . . should ask whether the state court's application of clearly established federal law was objectively reasonable." Id. at 409. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Harrington v. Richter, 131 S. Ct. 770, 784 (2011).

II.     *Petitioner's Claims*

The petition advances four claims for relief, all of which were presented to the state

16

courts on either direct appeal or petitioner's first § 440.10 motion. The claims are: (1) the trial court gave a prejudicial "no inference charge" that drew attention to petitioner's decision not to testify; (2) the prosecutor was permitted to elicit testimony from a detective that petitioner was arrested immediately after being identified in a lineup; (3) petitioner's sentence violates <u>Apprendi</u> and is excessive; (4) the evidence was insufficient to support conviction because of "newly discovered evidence" that another person confessed to the crime via sworn affidavit. Dkt. #1, at 5-9. Petitioner also seeks leave to amend his petition to add a claim of a Confrontation Clause violation based on the testimony of the detectives about interviewing other, unnamed witnesses. <u>See</u> Dkt. #9, at 1. The court ordered respondent to file a response to the motion addressing "the propriety of the amendment and the merits of the claim." Dkt. #10, at 1. Respondent opposed the amendment solely on the ground that the underlying claim is "meritless, and, at most constitutes harmless error." Dkt. #11, at 4.

    (a)    <u>Amendment to Petition</u>

Rule 15 of the Federal Rules of Civil Procedure provides that the court "should freely give leave [to amend the pleading] when justice so requires." Fed. R. Civ. Proc. 15(a)(2); <u>see</u> <u>Littlejohn v. Artuz</u>, 271 F.3d 360, 363-64 (2d Cir. 2001) (noting motions to amend habeas petitions are governed by Rule 15, and "nothing in AEDPA is inconsistent" with application of Rule 15). "This is particularly true when the party is proceeding <u>pro se</u>." <u>Theard v. Artus</u>, No. 09 CV 5702(NGG)(LB), 2011 WL 4056054, at *1 (E.D.N.Y. Sept. 1, 2011) (citing <u>Cuoco v. Moritsugu</u>, 222 F.3d 99, 112 (2d Cir. 2000)). Although petitioner filed his motion to amend after respondent had filed his response to the court's order to show cause, there is no basis to find that there was bad faith or a dilatory motive on the part of petitioner. <u>See</u> <u>Saxon v. Lempke</u>, No. 09

Civ. 1057(PGG)(KNF), 2010 WL 4608613, at *3 (S.D.N.Y. Nov. 12, 2010) (permitting amendment where "neither bad faith nor dilatory motive on [petitioner's] part appears to exist respecting the filing of his motion for leave to amend the petition"). Petitioner's Confrontation Clause argument is not new to the proceedings; it was set forth at length in his direct appeal brief. See Br. for Def.-Appellant, Dkt. #6, Ex. 1, at 47-56. Respondent has not alleged any prejudice that would result from permitting petitioner to amend. While respondent's argument that petitioner's claim is meritless "may ultimately prove correct, the Court in its discretion, and in light of the liberal standards regarding motions to amend, grants petitioner's motion." Theard, 2011 WL 4056054, at *2. Petitioner's Confrontation Clause issue will therefore be considered as a fifth claim for relief.

    (b)    Claims that are Procedurally Defaulted

        Several of petitioner's claims are procedurally defaulted and therefore unreviewable by this court. "When a state court judgment rests upon an adequate and independent state law ground, federal courts lack jurisdiction on direct review to consider questions of federal law decided by the state court." Jones v. Stinson, 229 F.3d 112, 117 (2d Cir. 2000) (citing Coleman v. Thompson, 501 U.S. 722, 728 (1991)). "[T]he same doctrine 'bar[s] federal habeas when a state court decline[s] to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement.'" Id. (citing Coleman, 501 U.S. at 729-30). To foreclose federal review "the last state court to render judgment must clearly and expressly state . . . that its judgment rest[ed] on a state procedural bar." Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997) (alteration in original) (internal quotation marks omitted). The prohibition applies "even where the state court has also ruled in the alternative on the merits of the federal claim." Velasquez v.

Leonardo, 898 F.2d 7, 9 (2d Cir. 1990); see also Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law."). The Second Circuit has made clear that the state court must "actually state[]" that an "issue was not preserved" to bar federal habeas review. Stinson, 229 F.3d at 118.

New York Criminal Procedure Law § 470.05[2] requires parties to make a specific protest at the time of a claimed error to preserve an issue for appellate review. See, e.g., People v. Gray, 86 N.Y.2d 10, 19 (1995). A party's "failure to make objection at trial constitutes adequate procedural default under [N.Y. Crim. Proc. L.] section 470.05[2]," Garcia v. Lewis, 188 F.3d 71, 79 (2d Cir. 1999) (citing Fernandez v. Leonardo, 931 F.2d 214, 216 (2d Cir. 1991)), and this contemporaneous objection rule has been recognized as an independent and adequate state procedural rule barring habeas review. See, e.g., Richardson v. Greene, 497 F.3d 212, 218 (2d Cir. 2007); Garcia, 188 F.3d at 79; Bossett v. Walker, 41 F.3d 825, 829 n.2 (2d Cir. 1994); Felder v. Goord, 564 F. Supp. 2d 201, 223 (S.D.N.Y. 2008). A federal court will nonetheless consider a procedurally defaulted claim if the petitioner can show "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991).

The last state court to render a reasoned judgment on petitioner's claims was the Appellate Division, Second Department. See Mendez, 894 N.Y.S.2d at 902. The Court of

19

Appeals' subsequent denial without comment of petitioner's application for leave to appeal does not alter that conclusion. See Levine v. Comm'r of Corr. Servs., 44 F.3d 121, 126 (2d Cir. 1995). In affirming the judgment of conviction, the Appellate Division expressly invoked N.Y. Crim. Proc. Law § 470.05[2] when addressing the "no inference charge" claim, the claim regarding Det. Dalton's testimony that he arrested petitioner directly after the lineup, and the Apprendi claim, creating procedural bars to each. See Mendez, 894 N.Y.S.2d at 802. Even though the court alternatively found the first two claims to be harmless and the third meritless, it expressly relied upon an independent and adequate state ground for the procedural defaults.

This court is therefore proscribed from reviewing these claims unless petitioner can demonstrate cause and actual prejudice, or a fundamental miscarriage of justice. See McClesky v. Zant, 499 U.S. 467, 493-94 (1991). "In procedural default cases, the cause standard requires the petitioner to show that 'some objective factor external to the defense impeded counsel's efforts' to raise the claim in state court." Id. at 493 (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)). Once cause is shown, prejudice must be proven by showing that "there is a reasonable probability that the result of the trial would have been different" despite the Constitutional violation. Strickler v. Greene, 527 U.S. 263, 289 (1999) (internal quotation marks omitted). A defaulted claim may also be heard in order to avoid a fundamental miscarriage of justice – where a conviction is based upon a constitutional violation of one who is actually innocent. Murray, 477 U.S. at 496.

Petitioner asserts no external cause to warrant setting aside the procedural defaults. However, he does allege that he is actually innocent of the crime and proffers the affidavit from a fellow prisoner as evidence of his actual innocence. The court must therefore address whether

this evidence puts petitioner within the "narrow class of cases" implicating a fundamental

miscarriage of justice. Schlup v. Delo, 513 U.S. 298, 315 (1995) (internal quotation marks

omitted); see also Doe v. Menefee, 391 F.3d 147, 161 (2d Cir. 2004) ("[C]redible claims of

actual innocence are extremely rare . . . .") (internal quotation marks omitted). The threshold for

demonstrating actual innocence is high. As the Supreme Court has explained,

> It is not the district court's independent judgment as to whether reasonable doubt
> exists that the standard addresses; rather the standard requires the district court to
> make a probabilistic determination about what reasonable, properly instructed
> jurors would do. Thus, a petitioner does not meet the threshold requirement
> unless he persuades the district court that, in light of the new evidence, [it is more
> likely than not that] no juror, acting reasonably, would have voted to find him
> guilty beyond a reasonable doubt.

Schlup, 513 U.S. at 329.

Petitioner's evidence does not meet this high threshold. The affidavit from Indelecio

Afanador, an inmate currently serving a sentence of sixteen-to-life at Woodbourne Correctional

Facility,[3] claims that Afanador encountered Mendez during the afternoon meal run, Mendez told

him about the basis for his incarceration, and Afanador realized that Mendez was referring to a

crime that, in fact, Afanador committed with "two other male hispanic[s]." Aff. of Indelecio

Afanador, Dkt. #13, Ex. 1, at 1. The affidavit further claims that the robbery was actually a set-

up with one of the employees at the Medical Center who arranged to have $150,000 cash on the

premises (supposedly derived from false insurance claims), which would be taken and then

would not be reported to the police. Id. at 2. This employee allegedly told Afanador that he

"would have no need for any 'weapons' whatsoever, because there are none held on the

---

[3] See Dep't of Corr. & Cmty. Supervision, Inmate Population Information Search,
http://nysdoccslookup.doccs.ny.gov (enter "02-A-4515" in "DIN" field, then click "Submit")
(last visited Dec. 12, 2012).

premises." Id. Nevertheless, the three robbers, including Afanador "acted as though we were armed to insure their full attention and cooperation, as it had been agreed and established by the set-up man." Id. The affidavit goes on to speculate that Mendez was accused of the crime because he hung out in the neighborhood. Id. at 3-4.

Putting aside the amazing coincidence that Mendez would, by chance, describe the facts of his crime to the individual who actually committed it, Afanador's affidavit conflicts with the evidence adduced at trial. Both Zakharov and Jacobs testified that two individuals robbed the Medical Center, not three. Furthermore, they both testified that one of the robbers was African-American, while Afanador's affidavit claims that "I and two other male hispanic[s]," id. at 1, committed the crime. No evidence suggested that any additional sum of money was stolen (though the absence of such evidence is not inconsistent with Afanador's "set-up" narrative). Moreover, had Afanador testified before the jury, the prosecutor could have impeached him with his 2002 burglary conviction. See People v. Mercado, 497 N.Y.S.2d 957, 958 (N.Y. App. Div. 1986) (permitting impeachment of defendant with prior crimes involving burglary because "prior crimes demonstrate dishonesty and untrustworthiness") (internal quotation marks omitted) (citing People v. Sandoval, 314 N.E.2d 413, 418 (N.Y. 1974)). It is therefore unlikely – and certainly not "more likely than not" – that the jury would have credited Afanador's account to the exclusion of the other evidence presented at trial. The Appellate Division, in ruling on petitioner's § 440.10 motion, noted that the affidavit "merely contradicted the evidence adduced at trial, and was not 'of such character as to create a probability that had [it] been received at the trial the verdict would have been more favorable to the defendant.'" Mendez, 894 N.Y.S.2d at 901 (alteration in original) (quoting N.Y. Crim. Proc. L. § 440.10(1)(g)). If the evidence cannot

create such a probability under state law, it cannot be said to meet the higher federal threshold that "no reasonable juror," Schlup, 513 U.S. at 329, having heard the evidence, would have voted to convict. Accordingly, petitioner has failed to demonstrate actual innocence sufficient to warrant excusing the procedural default.

Even if the procedural default were excused, the defaulted claims would fail on the merits. Petitioner's claim that the trial court erroneously gave a "no adverse inference" charge is based on the New York statutory requirement that such a charge may be given "[u]pon request of a defendant who did not testify in his own behalf, but not otherwise." N.Y. Crim. Proc. L. § 300.10(2). This is a state law claim, and "'federal habeas corpus relief does not lie for errors of state law.'" Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999) (quoting Estelle v. McGuire, 502 U.S. 62, 67 (1991)). Similarly, petitioner's claim that it was error to elicit testimony from Det. Dalton that he placed petitioner under arrest following the October 4 lineup, is based upon the common law rule, articulated in People v. Trowbridge, 113 N.E.2d 841 (N.Y. 1953), superseded in non-relevant part by statute, N.Y. Crim. Proc. L. § 60.25, as recognized in People v. Lagana, 324 N.E.2d 534, 535 (N.Y. 1975), prohibiting bolstering of a witness's out-of-court identification.[4] This, too, is a state law claim that does not raise a federal question. See Diaz v. Greiner, 110 F. Supp. 2d 225, 234 (S.D.N.Y. 2000) ("Bolstering claims have been (expressly) held not to be cognizable on federal habeas review."); Smith v. Riley, No. 90-CV-

---

[4]Petitioner cites the Sixth Amendment as the constitutional basis for this claim, but the claim would more properly be brought under the Fifth Amendment for denial of due process. Nevertheless, "[a]lthough bolstering is a practice prohibited . . . in New York, the practice is not forbidden by the Federal Rules of Evidence and is not sufficiently prejudicial to deprive a defendant of his due process rights to a fair trial." Vega v. Berry, No. 90 Civ. 7044 (LBS), 1991 WL 73847, at *2 (S.D.N.Y. Apr. 29, 1991).

3094 (JG), 1995 WL 1079778, at *6 (E.D.N.Y. Jan. 26, 1995) ("A claim of improper 'bolstering' in violation of Trowbridge is not a cognizable basis for federal habeas relief."). Finally, while petitioner's Apprendi claim does present a federal question, the Second Circuit has held that New York's persistent felony offender statute does not violate Apprendi, thus foreclosing petitioner's claim. See Portalatin v. Graham, 624 F.3d 69, 93-94 (2d Cir. 2010) (en banc).

      (c)     Newly Discovered Evidence

Petitioner seeks habeas relief on the stand-alone basis of Afanador's affidavit confessing to the crime because, petitioner alleges, "the evidence was not sufficient to support petitioner[']s conviction." Dkt. #1, at 9. This claim is without merit for several reasons. First, as discussed above, the evidence proffered in Afanador's affidavit is insufficiently credible or persuasive for the state court's rejection of it to be considered unreasonable. Second, issues involving the sufficiency of the evidence involve state law and "do[] not rise to constitutional dimensions," Griffin v. Martin, 409 F.2d 1300, 1302 (2d Cir. 1969), unless, based on the evidence produced at trial, "'no rational trier of fact could have found proof of guilt beyond a reasonable doubt,'" Fama v. Comm'r of Corr. Serv., 235 F.3d 804, 811 (2d Cir. 2000) (quoting Jackson v. Virginia, 443 U.S. 307, 324 (1979)). Again, for the same reasons the affidavit does not compel excusing the procedural default, Mendez cannot meet this high standard. Third, even if petitioner is actually innocent, the Supreme Court has held that actual innocence is not an independent basis for federal habeas relief. Herrera v. Collins, 506 U.S. 390, 416-17 (1993). Accordingly, petitioner's claim for relief based on newly discovered evidence fails.

(d)    Excessive Sentence

Petitioner also contends that his sentence is unconstitutional because it is harsh and

excessive. Dkt. #1, at 8. Although this claim is attached to his Apprendi claim, it was raised in

the trial court, S. at 18-19, and was adjudicated by Appellate Division on the merits. Mendez,

894 N.Y.S.2d at 902.

To evaluate claims of excessive sentencing, the Supreme Court has articulated a principle

of "gross disproportionality," which finds unconstitutional under the Eighth Amendment only

extreme sentences that are grossly disproportionate to the crimes for which they are imposed.

See Harmelin v. Michigan, 501 U.S. 957 (1991); Solem v. Helm, 463 U.S. 277 (1983); Rummel

v. Estelle, 445 U.S. 263 (1980). Federal courts reviewing sentences imposed by state courts on

habeas review "should grant substantial deference to the broad authority that legislatures

necessarily possess in determining the types and limits of punishments for crimes, as well as to

the discretion that trial courts possess in sentencing convicted criminals." Solem, 463 U.S. at

290. The "gross disproportionality" principle finds sentences disproportionate to their crimes

"only in the exceedingly rare and extreme case" and is reserved "for only the extraordinary case."

Lockyer v. Andrade, 538 U.S. 63, 73, 77 (2003) (internal quotation marks and citation omitted).

In the Second Circuit, "[n]o federal constitutional issue is presented where . . . the sentence is

within the range prescribed by state law." White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992).

New York's persistent felony offender ("PFO") law, N.Y. Penal L. § 70.10, defines a

PFO as a "person, other than a persistent violent felony offender . . . who stands convicted of a

felony after having previously been convicted of two or more felonies." Id. § 70.10(1)(a). Once

the person is determined to be a PFO, the sentencing court "may impose the sentence of

imprisonment authorized . . . for a class A-I felony." Id. § 70.10(2). The sentence for an A-I

felony in New York is life imprisonment, id. § 70.00(2)(a), with a minimum term of fifteen to

twenty-five years, id. § 70.00(3)(a)(i). Therefore, because Mendez was previously adjudicated a

PFO, a sentence of twenty-to-life for each count was within the statutory range.

Further, New York Penal Law provides that "when multiple sentences of imprisonment

are imposed on a person at the same time . . . the sentence or sentences imposed by the court

shall run either concurrently or consecutively with respect to each other . . . in such manner as the

court directs at the time of sentence." Id. § 70.25(1). New York law permits consecutive

sentences for robberies of separate victims "'within a single extended transaction.'" Oyague v.

Artuz, 393 F.3d 99, 105 (2d Cir. 2004) (quoting People v. White, 597 N.Y.S.2d 117, 119 (N.Y.

App. Div. 1993)). Further, New York courts have held that the imposition of consecutive prison

sentences for such separate and distinct acts is not harsh and excessive. See, e.g., People v. Audi,

931 N.Y.S.2d 418, 421 (N.Y. App. Div. 2011). Accordingly, petitioner's consecutive sentences

are permitted under New York law.

Furthermore, the state court's determination that the sentence was not excessive was not

an unreasonable application of "clearly established Federal law, as determined by the Supreme

Court of the United States." 28 U.S.C. § 2254(d)(1). To the contrary: In Ewing v. California,

538 U.S. 11 (2003), the Supreme Court upheld California's "Three Strikes" law, which, like New

York's PFO law, mandated an indeterminate term of life imprisonment for defendants who had

two prior "serious" or "violent" felony convictions. Id. at 16. The Court held that Ewing's

sentence of twenty-five years to life for shoplifting three golf clubs was not grossly

disproportionate. Id. at 30-31. Accordingly, although a sentence of forty-years-to-life for a

robbery in which no one was hurt is unquestionably severe, the state court's determination that

petitioner's sentence was not excessive was consistent with – not contrary to – clearly established

federal law.

    (e)    Confrontation Clause Violation

Finally, petitioner charges that his right to confront the witnesses against him was

violated when Det. Closs testified that he spoke to unnamed "witnesses," who led him to believe

that Mendez was involved in the crime. The Appellate Division did not address this issue

explicitly, saying only, "The defendant's remaining contentions are without merit." Mendez, 894

N.Y.S.2d at 902. However, it has been the law of the Second Circuit for over a decade that "a

state court adjudicates a petitioner's federal constitutional claims on the merits whenever it (1)

disposes of the claim on the merits, and (2) reduces its disposition to judgment." Aparicio v.

Artuz, 269 F.3d 78, 93 (2d Cir. 2001) (internal quotation marks omitted). "[T]o invoke the

deferential standards of AEDPA, the state court need only dispose of the petitioner's federal

claim on substantive grounds, and reduce that disposition to judgment. No further articulation of

its rationale or elucidation of its reasoning process is required." Id. at 93-94. The Supreme

Court recently reinforced this rule in Richter, holding, "Where a state court's decision is

unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing

there was no reasonable basis for the state court to deny relief." 131 S. Ct. at 784. Consequently,

the Appellate Division's terse statement regarding petitioner's "remaining contentions" is an

adjudication on the merits that must be accorded deference under AEDPA. See Ryan v. Miller,

303 F.3d 231, 245-46 (2d Cir. 2002) (Appellate Division's brief statement that "defendant's

remaining contentions are either unpreserved . . . or without merit" was merits adjudication of

Confrontation Clause claim, to be analyzed under AEDPA "unreasonable application" standard) (internal quotation marks omitted).

(i)    Was there a Confrontation Clause violation?

The Confrontation Clause provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "[T]his bedrock procedural guarantee applies to both federal and state prosecutions." Crawford v. Washington, 541 U.S. 36, 42 (2004). "[T]he principal evil at which the Confrontation Clause was directed was the . . . use of ex parte examinations as evidence against the accused." Id. at 50. The Sixth Amendment thus bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Id. at 53-54. Unsworn statements elicited by police officers in the course of an interrogation are considered testimonial for Confrontation Clause purposes. United States v. Logan, 419 F.3d 172, 177 (2d Cir. 2005). The Second Circuit has held that "'[t]o implicate the defendant's confrontation right, [a] statement need not have accused the defendant explicitly, but may contain an accusation that is only implicit.'" Ryan, 303 F.3d at 248 (quoting Mason v. Scully, 16 F.3d 38, 42-43 (2d Cir. 1994)). However, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Crawford, 541 U.S. at 59 n.9 (citing Tennessee v. Street, 471 U.S. 409, 414 (1985)).

The testimony at issue here is the direct examination of Det. Closs and, to a lesser extent, that of Det. Dalton. Over objection, the prosecutor elicited from Det. Closs that, as part of his investigation, he interviewed "victims and other witnesses." R. at 135. Through these "victims

28

and other witnesses," Det. Closs testified he learned: (1) that two people had committed the
robbery; (2) that one was a male black, approximately thirty-five years old, with high cheek
bones, and the other a male Hispanic, approximately twenty-eight years old, with dark hair; (3)
that the black male was approximately five feet, ten inches, and the Hispanic man was shorter
than that. R. at 135-37. The trial court instructed the jury that these descriptions were "being
offered just to show the information he had and why he proceeded on the investigation the way
he did." R. at 137. Det. Closs also testified that he apprehended Reid after receiving "a phone
cal[l] from another detective from another unit." R. at 138. The trial court told the jury, "It's
only going in not for its truth, but to help explain why this officer went where he did and how he
focused on this gentleman." R. at 138. Following the conference in which the basis for the
objections were discussed and defense counsel took exception to the court's ruling, R. at 180, the
prosecutor was permitted to ask Det. Dalton, "[A]s a result of that investigation with Detective
Closs, did you obtain information that led you to believe that these 2 defendants might have been
involved in the robbery of September 14th, 2001," to which Det. Dalton replied in the
affirmative, R. at 185. The trial court then instructed the jury:

> Ladies and gentlemen, the fact that they developed information, you are not to
> consider it when you determine the guilt or innocence. The reason I'm allowing
> to you hear it [sic] is to explain to you why the officers focused on these 2
> defendants during the course of their investigation. Not to be considered for their
> guilt, only to explain why they were looking for them or they focused on them.
> Everybody understand that? Good.

R. at 185-86. The statements elicited by the prosecutor were not hearsay statements that directly
accused Mendez, but they implicitly suggested that the "other witnesses," who did not testify at
trial, provided descriptions of him and Reid and ultimately led the detectives to focus their

investigation on Mendez and Reid. See Ryan, 303 F.3d at 248-49 (describing law of the circuit condemning "practices designed to circumvent" the Confrontation Clause "by asking a witness what he learned from out-of-court declarant, as opposed to asking what an out of court declarant said") (internal quotation marks omitted).

The prosecutor argued at trial, R. at 174, and respondent now argues on appeal, Dkt. #11, at 5-8, that these statements were admissible as "background" information on the detectives' investigation, not for the truth. Id. If this is the case, the testimony would not be hearsay and, consequently, would not violate the Confrontation Clause. Crawford, 541 U.S. at 59 n.9. Such background information may be admissible if "(1) 'the non-hearsay purpose by which the evidence is sought to be justified is relevant,' and (2) 'the probative value of this evidence for its non-hearsay purpose is [not] outweighed by the danger of unfair prejudice resulting from the impermissible hearsay use of the declarant's statement.'" Ryan, 303 F.3d at 252 (alteration in original) (quoting United States v. Reyes, 18 F.3d 65, 70 (2d Cir. 1994)). "Two common scenarios in which the admission of testimony as background evidence may be appropriate are as testimony helpful in clarifying non-controversial matter[s] without causing unfair prejudice on significant disputed matters, and as appropriate rebuttal to initiatives launched by the defendant." Id. at 253 (alteration in original) (internal quotation marks omitted).

In Reyes, the Second Circuit articulated the following guiding questions for analyzing the relevance and prejudice prongs of the background information test:

> Questions involved in the determination of the relevance and importance of such
> evidence include: (i) Does the background or state of mind evidence contribute to
> the proof of the defendant's guilt? (ii) If so, how important is it to the jury's
> understanding of the issues? (iii) Can the needed explanation of background or
> state of mind be adequately communicated by other less prejudicial evidence or by

instructions? (iv) Has the defendant engaged in a tactic that justifiably opens the door to such evidence to avoid prejudice to the Government?

Questions involved in the assessment of potential prejudice include: (v) Does the declaration address an important disputed issue in the trial? Is the same information shown by other uncontested evidence? (vi) Was the statement made by a knowledgeable declarant so that it is likely to be credited by the jury? (vii) Will the declarant testify at trial, thus rendering him available for cross-examination? If so, will he testify to the same effect as the out-of-court statement? Is the out-of-court statement admissible in any event as a prior consistent, or inconsistent, statement? (viii) Can curative or limiting instructions effectively protect against misuse or prejudice?

Reyes, 18 F.3d at 70-71 (footnotes omitted). In that case, the Circuit held that an agent's testimony about what a cooperator told her about the defendant's role in a cocaine importation conspiracy was inadmissible as evidence of the agent's state of mind during her investigation, even though the trial court instructed the jury not to consider the evidence for its truth. Id. at 69. The court held the agent's state of mind, though an important link in the prosecution's narrative, was not relevant to the defendant's guilt. Id. at 71. Further, the statements were prejudicial because they addressed the most important disputed issue at trial – they directly implicated the defendant in the crime. Id. Although the court did not explicitly reference it in its prejudice analysis, the prosecutor in Reyes relied heavily on the inadmissible evidence in summation. See id. at 68.

In Ryan, the Second Circuit applied the factors outlined in Reyes to the admission of a detective's testimony that strongly implied that after learning of a co-defendant's confession,[5] he told officers to advise Ryan of his Miranda rights. 303 F.3d at 252-53. The court preliminarily

_____

[5]That the confession was previously held unreliable as a matter of law, see Quartararo v. Mantello, 715 F. Supp. 449, 466 (E.D.N.Y 1989), was an important fact in the Ryan case. See, e.g., 303 F.3d at 240.

held that even though the testimony did not directly implicate Ryan, "the testimony violated the Confrontation Clause because the plain implication of the testimony was that [the co-defendant] accused Ryan." Id. at 251 (internal quotation marks omitted). The court then examined whether the testimony fit into the background exception. The court noted that the testimony was "only relevant if we assume its truth," and therefore held, "[b]ecause the testimony is only relevant to the very purpose for which the jury cannot consider it, it is not admissible testimony under the background exception." Id. at 253. Again, in Ryan, the prosecutor capitalized on the problematic testimony in summation, making "several comments referring to the interrogations that resulted in the confessions and accusations." Id. at 244.

These cases, as well as Mason v. Scully, 16 F.3d at 43-44 (holding testimony of detective about hearsay statement of non-testifying co-defendant violated Confrontation Clause), were decided pre-Crawford and applied the Supreme Court's precedent in Bruton v. United States, 391 U.S. 123, 135-36 (1968) (holding admission of non-testifying accomplice's confession violated Confrontation Clause). Since Crawford, several Courts of Appeals and courts in this district have had opportunity to examine the background exception in habeas cases.[6] In Jones v. Basinger, the Seventh Circuit granted a habeas petition where police detectives "provided a detailed double-hearsay account of the crimes" and "[t]he prosecution was even allowed to bolster the credibility of the non-testifying tipster, a point that would have been completely

---

[6]The Second Circuit has also dealt with the background exception in several cases on direct review. See United States v. Gomez, 617 F.3d 88, 92 (2d Cir. 2010) (rejecting argument that hearsay testimony was necessary as background); United States v. Johnson, 529 F.3d 493, 500-01 (2d Cir. 2008) (acknowledging that background may be appropriate in some cases, but rejecting its application in case of "egregiously abusive testimony" by DEA agent); United States v. Paulino, 445 F.3d 211, 218 (2d Cir. 2006) (hearsay statements admissible as background where statement was favorable, not prejudicial, to defendant).

irrelevant if the tip were not being used to prove the truth of its contents." 635 F.3d 1030, 1036-37 (7th Cir. 2011). Notably, in that case, "the trial court made no effective effort to caution the jury not to consider [the] statement for its truth" and "[i]n closing arguments, the prosecution further bolstered its case with the double-hearsay." Id. at 1037. The court noted that "[s]uch statements offered to show 'background' or 'the course of the investigation' can easily violate a core constitutional right, are easily misused, and are usually no more than minimally relevant," id. at 1046, and held that the state court was unreasonable in failing to apply Crawford to what it considered non-hearsay evidence, id. at 1051-52. In Ocampo v. Vail, the Ninth Circuit reversed a habeas denial in a case where two witnesses testified about the defendant's role in a shooting, and the out-of-court testimony of a third witness (Vasquez), was admitted through the testimony of two detectives to corroborate the in-court witnesses. 649 F.3d 1098, 1102-1105 (9th Cir. 2011). In this case as well, "[t]he importance of the two detectives' testimony regarding Vasquez's interview was highlighted by the prosecution in closing arguments." Id. at 1104. The state court below had held that there was no Confrontation Clause violation on the basis that the testimony was only "outline" and lacked "substance," id. at 1113 (internal quotation marks omitted); accordingly, the Ninth Circuit did not directly examine the background exception. However, it explained the prejudice of the out-of-court statements as follows: "The prosecutor's closing argument . . . framed for the jury precisely what they were meant to take from the detective's testimony about Vasquez: that he had confirmed both Ocampo's presence that night and that Ocampo was the shooter." Id. The court therefore found the state court's decision an unreasonable application of Crawford.

In contrast to these decisions, several courts of this district have denied habeas relief on

the ground that testimony that might otherwise be hearsay fit into the background exception. <u>See</u> <u>Moore v. Ercole</u>, No. 09-CV-1003 (CBA), 2012 WL 407084, at *8-9 (E.D.N.Y. Feb. 8, 2012) (brief testimony about detective conducting interviews that eventually led to defendant did not violate Confrontation Clause where "[t]he prosecutor never emphasized or relied on this testimony for the impermissible inference that individuals had indeed implicated" defendant); <u>Reyes v. Ercole</u>, No. 08-CV-4749 (JFB), 2010 WL 2243360, at *9-10 (E.D.N.Y. June 1, 2010) (references to out-of-court statements only minor part of detective's testimony, and prosecutor alluded to them in summation only to show defendant's confession was voluntary); <u>Summerville</u> <u>v. Conway</u>, No. 07 Civ. 4830(BMC)(RML), 2008 WL 3165850, at *2-3 (E.D.N.Y. Aug. 6, 2008) ("The Detective's reference to 'various people' does not mean that anyone in particular accused petitioner; detectives assemble information from a variety of sources in deciding whom to identify as a suspect. His conclusion was merely background to show that the police had identified petitioner as a suspect promptly after the shooting, even though they did not arrest him for nearly two months after."); <u>Buenos Ruiz v. Fischer</u>, No. 06 CV 0301(NGG), 2007 WL 1395462, at *4 (E.D.N.Y. May 10, 2007) ("Here, the evidence was admitted to explain how the investigation of the Petitioner progressed and to explain the lapse of time between the commission of the crime and the apprehension of Petitioner. Any prejudice resulting from an implication that Balenzuela had inculpated Petitioner by giving Detective Martinez a photograph of Petitioner was minimal, if at all."); <u>Vachet v. West</u>, No. 04-CV-3515JG, 2005 WL 740640, at *10 (E.D.N.Y. Mar. 24, 2005) (statement not so prejudicial as to rise to level of constitutional violation where judge issued curative instruction and prosecutor "did not belabor the substance of the statement in his summation").

Applying the two-prong <u>Reyes</u> test to this case, it is clear that the non-hearsay purpose for which the statements were introduced was of dubious relevance. Evidence about why the detectives focused on Mendez and Reid was not especially helpful in clarifying non-controversial issues in the case. At best, the evidence was marginally relevant to the disputed issue of whether the two defendants were in fact guilty – but for that purpose it was inadmissible. However, the prejudice resulting from the admission of the statements was not substantial. The statements admitted were not nearly as egregious as the testimony in <u>Ryan</u>, <u>Jones</u> or <u>Ocampo</u>. The facts implicating Mendez that were elicited from Det. Closs – that two individuals had committed the robbery, and descriptions of those two individuals – were not seriously in dispute and were not inconsistent with defense counsel's theory that Zakharov was mistaken in his identification of Mendez as the man who robbed him. <u>See</u> R. at 276-78, 280-82. Further, the testimony elicited from Det. Dalton – that in the course of the investigation, he was led to believe that Mendez and Reid "might have been involved in the robbery," R. at 185 – was limited and equivocal and was followed immediately by a limiting instruction. Further, the prosecutor in this case (no doubt mindful of the prior reversal) focused his summation on the testimony of Zakharov and Jacobs. His only remark that went near the detectives' testimony was: "It's not about how many witnesses the police detective spoke to or interviewed in this case. However, what it is about is whether or not the work they did led to the arrest of the right people in this case, Reggie Reid and Ricardo Mendez." R. at 309. This comment actually downplayed the problematic testimony of the detectives. Petitioner's counsel also questioned Zakharov about whether he had seen statements from other witnesses, R. at 72, which, if not opening the door to such testimony, served to further diminish the danger of unfair prejudice from the jury hearing about other

witnesses. This case is similar to other cases from this district involving background evidence, and the evidence here was even less prejudicial than that in Vachet, where an out-of-court witness's statement that she saw the defendant with the weapon used in the crime was admitted, but followed by a limiting instruction. See 2005 WL 740640, at *10 ("[T]he statement was not so prejudicial that I should reject the presumption that a jury follows a court's instructions.").

This court may not agree with the trial court that the reference to other witnesses was necessary to prevent the jury from "wander[ing] helpless trying to sort out ambiguous but material facts." R. at 173 (internal quotation marks omitted). If anything, such testimony was likely to confuse the jury further. See United States v. Dukagjini, 326 F.3d 45, 57 n.7 (2d Cir. 2002) ("Indeed, the hearsay problem is exacerbated when the out-of-court source of the evidence is not revealed, because the jury is not even able to factor into its deliberations the reliability (or unreliability) of the particular source."). Accordingly, if this court were deciding the admissibility of the testimony in the first instance, the evidentiary ruling might well be different. But that is not the role of a reviewing court, let alone one constrained by the deferential standard of AEDPA. See Aparicio, 269 F.3d at 94 ("In short, a federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently."). Given the weak evidence of prejudice in this case, this court cannot conclude that the state court's determination that petitioner's Confrontation Clause claim was without merit was "contrary to, or involved an unreasonable application of, clearly established federal law." 28 U.S.C. § 2254(d)(1).

(ii)    Harmlessness Analysis

Even if petitioner could demonstrate a Confrontation Clause violation, this court would

still be required to defer to the state court's implicit determination that such violation was harmless. Mitchell v. Esparza, 540 U.S. 12, 18 (2003) (federal habeas relief may only be granted if state court applied harmless-error review in an "objectively unreasonable" manner). The Second Circuit has recently made clear that the standard for harmlessness to be applied on habeas review is that of Brecht v. Abrahmson, 507 U.S. 619 (1993), namely, whether the constitutional violation had a "substantial and injurious effect or influence in determining the jury's verdict," id. at 637 (internal quotation marks omitted). Wood v. Ercole, 644 F.3d 83, 93-94 (2d Cir. 2011) (citing Fry v. Pliler, 551 U.S. 112, 121-22 (2007)). As the court explained, "In assessing whether the erroneous admission of evidence had a substantial and injurious effect on the jury's decision, [we consider] the importance of the . . . wrongly admitted [evidence], and the overall strength of the prosecution's case." Id. at 94 (alterations in original) (internal quotation marks omitted).

> The importance of wrongly admitted evidence is determined by the prosecutor's conduct with respect to the . . . evidence, whether the evidence bore on an issue . . . plainly critical to the jury's decision, and whether [it] was material to the establishment of the critical fact, or whether it was instead corroborated and cumulative.

Id. (alterations in original) (internal citations and quotation marks omitted).

The prosecution's case here was not especially strong. It relied on the in-court identification of a single witness, Zakharov, who saw petitioner's face only briefly during the robbery. While Zakharov also identified petitioner in a line-up, all but one of the fillers in the lineup was significantly taller than petitioner, somewhat diminishing its reliability. See United States v. Wong, 40 F.3d 1347, 1359-60 (2d Cir. 1994) (in determining suggestiveness of a lineup, "the principal question . . . is whether the appearance of the accused, matching descriptions given by the witness, so stood out from all of the other[s]") (internal quotation

marks omitted). The prosecutor also cited petitioner's flight from the police and his confession as evidence of guilt. The flight, however, can easily be explained by the other crime of conviction, which was essentially undisputed at trial: possession of heroin. The confession, though placing petitioner at the scene of the crime, was nevertheless exculpatory and may have been responsive solely to petitioner being picked out of the lineup. While Zakharov's testimony alone was sufficient for the jury to convict, harmless-error analysis does not turn on sufficiency of the evidence. See Kotteakos v. United States, 328 U.S. 750, 765 (1946) ("The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."). Further, the court notes the Appellate Division's finding that the evidence at the first trial, in which Zakharov also was the sole witness who identified Mendez, see Br. for Def.-Appellant, People v. Mendez, No. 02-11538, at 31, was "less than overwhelming," 804 N.Y.S.2d at 338.

Nevertheless, as discussed above, the importance of the wrongly admitted evidence, assuming it was wrongly admitted, was not great. The prosecution did not rely on it in summation, it did not bear on an issue plainly critical to the jury's decision, and it was largely cumulative of the testimony of Zakharov and Jacobs. This court cannot say with any certainty that this evidence had a "substantial and injurious effect or influence in determining the jury's verdict," Brecht, 507 U.S. at 637 (internal quotation marks omitted), and the court does not have a "grave doubt" as to the harmlessness of the error. Cf. O'Neal v. McAninch, 513 U.S. 432, 445 (1995). Accordingly, the state court's implicit decision that any Confrontation Clause violation was harmless, was not objectively unreasonable.

## CONCLUSION

For the foregoing reasons, the petition is denied. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. See 28 U.S.C. § 2253(c)(2). The Clerk of the Court is directed to enter judgment accordingly and close the case.

SO ORDERED.

Allyne R. Ross
United States District Judge

Dated: December 18, 2012
      Brooklyn, New York

**Service List:**

Ricardo Mendez
02-A-6771
Auburn Correctional Facility
P.O. Box 618
Auburn, NY 13024